**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

RENEE SOLOFRA,

          **Plaintiff,**

v.

          **Case No.: 2025-cv-11607**

AMERICAN AIRLINES, INC.
          **Defendant.**

### PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT AMERICAN AIRLINES, INC'S MOTION TO DISMISS

Plaintiff, Renee Solofra, by and through her attorneys, Romanucci & Blandin, LLC, submits this Response in Opposition to Defendant American Airlines, Inc.'s Motion to Dismiss Counts II, III, and IV of the First Amended Complaint. The Court should deny Defendant's Motion.

### STATEMENT OF FACTS RELEVANT TO THIS MOTION

In 2023, Plaintiff Renee Solofra was a ticketed passenger on an American Airlines flight. (ECF 20 ¶ 16.) She was seated in a middle seat next to Daniel McAdams, an adult male passenger who was visibly intoxicated and smelled of alcohol at the time of boarding. (*Id.* ¶¶ 19–21.) American Airlines personnel permitted McAdams to board in that condition and, once airborne, continued to serve him alcohol. (*Id.* ¶¶ 21, 99–102.) During the flight, American employees interacted socially with McAdams, repeatedly served him alcohol, and left him seated next to Plaintiff despite his visible intoxication. (*Id.* ¶¶ 99–104.)

While seated next to Plaintiff, McAdams engaged in unwanted conversation, placed his hand on Plaintiff's lap, grabbed her neck, and grabbed her breast. (*Id.* ¶¶

20, 22.) The assault occurred while American had a duty to monitor passengers, not allow intoxicated/dangerous passengers to board, and to intervene to protect passengers. (*Id.* ¶¶ 65-69.) Plaintiff reported the assault immediately after deplaning, and airport authorities arrested McAdams. (*Id.* ¶¶ 28–29.)

This assault occurred against the backdrop of a documented and escalating problem of in-flight sexual assaults known within the airline industry, including aboard American Airlines flights. (*Id.* ¶¶ 35–45.) American had prior reported incidents of in-flight sexual assault involving passenger misconduct. (*Id.* ¶¶ 46–51.) In 2018, the FBI issued a public advisory warning of a substantial increase in reported in-flight sexual assaults and explaining that the confined nature of aircraft cabins increases the risk of sexual violence. (Id. ¶¶ 36–37.)

Despite this known risk, American represented to passengers—through its website, ticketing process, Standards of Business, Conditions of Carriage, safety messaging, and pre-boarding practices—that it monitored passenger behavior, enforced alcohol-service limits, and intervened when safety risks arose, thereby inducing passengers to rely on American to control the cabin environment and protect their safety. (*Id.* ¶¶ 47, Count II 80–83, Count II 79-83[1].) At the same time, American did not disclose material facts uniquely within its knowledge, including its awareness of prior in-flight sexual assaults involving intoxicated passengers and its failure to adequately monitor, limit, or intervene in alcohol-related passenger misconduct. (*Id.* Count III ¶¶ 82–88.)

---

[1] Due to a clerical numbering error, the First Amended Complaint contains two sets of paragraphs numbered ¶¶ 78–91: one set under Count II and a second set under Count III. Citations in this brief specify the relevant count (e.g., "Count II ¶ 81" or "Count III ¶ 81") to avoid confusion.

American's conduct on the day of Plaintiff's flight reflected the same practices it had concealed: permitting McAdams to board while visibly intoxicated, continuing to serve him alcohol, seating Plaintiff next to him, and failing to intervene despite an audible disturbance and Plaintiff's visible distress, thereby enabling the assault in a confined space from which Plaintiff could not escape. (*Id.* ¶¶ 97–106.)

Plaintiff relied on American's representations regarding passenger monitoring and safety in choosing to fly with American and in trusting that American would intervene if a safety risk arose during flight. (*Id.* Count III ¶¶ 82–90.) Had American disclosed the known risk of in-flight sexual assaults involving intoxicated passengers, or its failure to enforce its own safety and alcohol policies, Plaintiff would not have boarded the flight or remained seated next to McAdams. (*Id.* Count III ¶¶ 89)

As a direct and proximate result of American's control over the cabin environment, its continued service of alcohol, its failure to intervene, and its concealment of known safety risks, Plaintiff was sexually assaulted and suffered physical, emotional, and psychological injuries. (Id. ¶¶ 72-73, 77, 111.)

## ARGUMENT

Motions to dismiss under Rule 12(b)(6) attack the legal sufficiency of a pleading— they do not challenge its factual allegations. Therefore, a court must "construe all of the plaintiff's factual allegations as true, and must draw all reasonable inferences in the plaintiff's favor." *Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011). A complaint will survive a motion to dismiss if these allegations state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To state a claim, a plaintiff's allegations need only make out a "plausible account" of his or her

entitlement to relief. *Geinosky v. City of Chicago*, 675 F.3d 743, 749 (7th Cir. 2012). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This happens when the complaint alleges facts that "give enough details about the subject-matter of the case to present a story that holds together. In other words, the court will ask itself could these things have happened, not did they happen." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010).

## I. COUNTS II AND III ARE NOT PREEMPTED BY THE AIRLINE DEREGULATION ACT AND STATE PLAUSIBLE CLAIMS FOR FRAUD AND CONCEALMENT

### A. The Airline Deregulation Act Does Not Preempt Plaintiff's Fraud Claims.

American's primary argument is that Plaintiff's Illinois Consumer Fraud Act and fraudulent concealment claims are categorically preempted by the Airline Deregulation Act ("ADA"). That argument overreads the statute and mischaracterizes the nature of Plaintiff's claims.

The ADA preempts state laws "related to a price, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1). While the phrase "related to" is broad, the Supreme Court has made clear that it is not boundless, and that state-law claims with only a "tenuous, remote, or peripheral" connection to airline economics are not preempted. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 390 (1992). Critically, the ADA does not provide airlines with immunity from generally applicable state laws addressing fraud, deception, or concealment where those laws do not function as

4

economic regulation of airline pricing, routes, or services. *American Airlines, Inc. v. Wolens*, 513 U.S. 219, 228–29 (1995).

Plaintiff's fraud claims fall well outside the ADA's preemptive scope. Plaintiff does not seek to regulate how American prices tickets, structures routes, or designs the economic features of its services. Instead, she alleges that American concealed known, material **<u>safety risks</u>** while affirmatively representing—through its website, ticketing process, and Conditions of Carriage—that it monitored intoxicated passengers, enforced alcohol-service limits, and intervened when passenger safety was threatened. (ECF 20 ¶¶ 36, 47; Count II ¶ 81; Count III ¶ 81.) Those claims target deception and concealment concerning passenger safety, not airline economics.

American relies on *United Airlines, Inc. v. Mesa Airlines, Inc.*, 219 F.3d 605 (7th Cir. 2000), and related advertising cases to argue preemption. Those cases do not apply. In *Mesa*, the Seventh Circuit addressed claims that would have regulated competitive advertising and marketing practices—core economic conduct directly tied to airline competition. *Id.* at 609. Similarly, in *O'Callaghan v. AMR Corp.*, 2005 U.S. Dist. LEXIS 12889 (N.D. Ill. 2005), the claims involved a claim that passengers had been told lies regarding the amount of legroom they would receive. The passengers sought to impose state-law standards governing how airlines market or promote their services, which the court found impermissible. Plaintiff's claims do neither.

Here, Plaintiff alleges that American knew, through its own prior incidents, FBI advisories, and internal experience, of a documented and growing pattern of in-flight sexual assaults involving intoxicated passengers. Nevertheless, it continued a course of action that facilitated those risks; affirmatively represented that it

prioritized passenger safety and would intervened when risks arose; and failed to disclose material facts about known dangers uniquely within its knowledge. (ECF 20 ¶¶ 36, 47; Count II ¶ 81; Count III ¶ 81.) Those allegations concern concealment of known safety risks and resulting physical harm, not the regulation of airline "services" in the economic sense contemplated by the ADA.

Courts have repeatedly recognized that claims addressing safety failures and physical injuries do not regulate airline "services" within the meaning of the ADA. See, e.g., *Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 336–37 (5th Cir. 1995) (en banc) (distinguishing economic "services" from personal injury claims); *Charas v. Trans World Airlines, Inc.*, 160 F.3d 1259, 1265–66 (9th Cir. 1998) (en banc). Allowing Plaintiff's fraud claims to proceed would not require American to alter its rates, routes, or service offerings.

*Wolens* reinforces—not undermines—that conclusion. There, the Supreme Court was asked to determine the effect of the ADA on a class of Plaintiffs who believed that the defendant Airline's advertisements regarding its frequent-flyer program were deceptive. The Court held that states may not impose their own regulatory policies on airline services, but it expressly preserved claims enforcing an airline's own voluntary representations. 513 U.S. at 228–29. Plaintiff's fraud claims fall within that principle.

In short, this case is not an attempt to impose "its own substantive standards with respect to rates, routes, or services," which the ADA preempts. *Id.* at 226. This is an action by a private plaintiff seeking relief under state law for personal injuries

caused by alleged deception and concealment of known safety risks. The ADA does not preempt such claims.

**B.    Plaintiff Has Adequately Pleaded a Claim Under the Illinois Consumer Fraud Act and Rule 9(b)**

American argues that Count II fails under Rule 9(b). That argument misapplies the pleading standard and ignores the nature of Plaintiff's allegations. Rule 9(b) requires particularity, but it is applied flexibly where the fraud consists of material omissions and standardized, public-facing representations concerning information uniquely within the defendant's control.

Who. The Complaint identifies American Airlines as the actor responsible for the deceptive conduct, acting through its website, ticketing process, Conditions of Carriage, and safety messaging—corporate, passenger-facing communications. (ECF 20, Count II ¶ 81.)

What. Plaintiff alleges that American represented that it responsibly served alcohol, monitored passenger conduct, and intervened to protect safety, while omitting material facts about known risks and operational failures. (*Id.* Count II ¶ 83.) Plaintiff specifically alleges that American had a documented history of in-flight sexual assaults involving intoxicated passengers and failed to enforce its own alcohol and safety policies, rendering its safety representations misleading. (*Id.* Count II ¶ 83-86.)

When and where. The deceptive conduct occurred before Plaintiff's September 25, 2023 flight, during the ticketing and boarding process in Illinois, through American's publicly disseminated consumer-facing materials. (*Id.* Count II ¶ 82.)

7

**How.** Plaintiff alleges that American's deception operated through material omissions that distorted its safety representations, despite American's superior knowledge derived from prior incidents and complaints. (*Id.* Count II ¶¶ 83, 86.)

**Proximate cause.** Individual reliance is not required under the ICFA. Plaintiff alleges that American's deceptive conduct occurred primarily and substantially in Illinois and that, as a direct result, she was exposed to a known and recurring danger that ultimately materialized. (*Id.* Count II ¶¶ 84, 88, 89.)

These allegations satisfy Rule 9(b) and state a viable ICFA claim. Dismissal is unwarranted.

### C.      Fraudulent Concealment Is Adequately Pleaded.

Plaintiff alleges that American possessed superior, non-public knowledge of a recurring risk of in-flight sexual assault involving intoxicated passengers, derived from prior incidents, complaints, and industry warnings, while simultaneously representing that it monitored passenger behavior and intervened to protect safety. (ECF 20 ¶¶ 36–53, Count III 80–88.) Those allegations plausibly establish concealment of material facts uniquely within American's knowledge, an inability of passengers to discover those facts through reasonable inquiry, and resulting harm.

Rule 9(b) does not require Plaintiff to plead internal corporate documents or identify specific decision-makers at this stage, particularly where the concealed information is within the defendant's exclusive control. If the Court concludes that additional particularity is required, leave to amend should be granted. See Fed. R. Civ. P. 15(a).

## II. THE COMPLAINT STATES A COGNIZABLE CAUSE OF ACTION UNDER THE ILLINOIS GENDER VIOLENCE ACT (Count III)

### A. Illinois Appellate Authority Holds That Corporations Are "Persons" Subject to Liability Under the GVA

American Airlines argues that Plaintiff's Illinois Gender Violence Act ("IGVA") claim fails as a matter of law because corporations are not "persons" who can be held liable under the Act. (ECF 27 at 11.) That argument is foreclosed by binding Illinois appellate precedent.

The Illinois Appellate Court has squarely held that corporate entities are "persons" subject to liability under the IGVA. In *Gasic v. Marquette Mgmt., Inc.*, 2019 IL App (3d) 170756, the Court directly addressed whether a corporate defendant could be held liable for "personally" encouraging or assisting gender-based violence. The court answered that question in the affirmative, holding that "a legal entity, such as a corporation, can act 'personally' for purposes of giving rise to civil liability under the [Gender Violence] Act." *Id.* ¶ 19. No Illinois Court has reached a contrary conclusion, and the Illinois Supreme Court has never disagreed with *Gasic*. Under Illinois law, Appellate Court decisions are binding statewide unless and until the Illinois Supreme Court rules otherwise.

Because this case is before the Court under diversity jurisdiction, the governing inquiry is not whether some federal trial courts have disagreed with *Gasic*, but what Illinois law provides. Under *Erie Railroad Co. v. Tompkins*, this Court must apply Illinois substantive law as articulated by Illinois courts. 304 U.S. 64, 78 (1938). Where the Illinois Supreme Court has not spoken, Illinois Appellate Court decisions

9

control unless there is persuasive evidence the Supreme Court would rule differently. There is no such evidence here.

### B. Federal District Court Decisions Applying Pre-2024 Law Are Not Uniform, But Many Follow *Gasic*

After the enactment of the IGVA, federal district courts reached differing conclusions on whether corporations could be held liable under the Act. Several courts in this District adhered to *Gasic* and permitted IGVA claims to proceed against corporate defendants based on the Illinois Appellate Court's interpretation of the statute. See *Nor v. Alrashid*, 2022 WL 815542, at *5 (N.D. Ill. Mar. 17, 2022) ("Because the Illinois Appellate Court concluded that a corporation can be liable under IGVA under certain circumstances, the Court declines to dismiss Count III at this juncture."; *Solinski v. Higher Learning Comm'n*, 2021 WL 1293841, at *4 (N.D. Ill. Apr. 7, 2021); *Doe v. City of Chicago*, 2020 WL 1675639, at *4 (N.D. Ill. Apr. 6, 2020); *Boeving v. City of Collinsville, Ill.*, 2021 WL 5906087, at *3 (S.D. Ill. 2021).

As cited by Defendants, other district courts reached the opposite conclusion. ECF 27 at 11.) But this divergence among federal district courts does not alter the governing law.

American's reliance on contrary federal trial court decisions is therefore misplaced. Federal district court opinions do not establish Illinois law and cannot override binding Illinois appellate precedent. Under the *Erie* framework, this Court is required to follow *Gasic* and reject American's argument that corporations are categorically exempt from liability under the IGVA.

10

### C. The 2024 Amendments Codify *Gasic* and Confirm Legislative Intent to Include Corporate Defendants.

The 2024 amendments to the IGVA reinforce the conclusion that a corporation is a "person" subject to liability under the Act. It is true that amendments to the Act became effective on January 1, 2024, after the conduct here. See 740 ILCS 82/11; 740 ILCS 82/98. But the legislative history confirms that the amendments were intended to clarify—and to codify the interpretation adopted in *Gasic*—rather than to substantively rewrite the statute. The codification of *Gasic* resulted in response to inconsistent and non-precedential federal district court decisions.

Legislators explained that clarification was needed because certain federal courts had reached inconsistent conclusions about employer liability under the IGVA. Immediately before passage, Representative Guzzardi stated that "[t]here has been some discussion in the courts about when or if an employer ought to be liable for … gender-based violence... Some courts have said yes. Some courts have said no. That lack of clarity is not good for survivors." (Ex. A, Illinois House of Representatives Debate (Mar. 23, 2023) at 77–78.) The amendments thus reflect legislative agreement with *Gasic*'s interpretation that corporate entities, acting through their employees, may be held liable under the IGVA. The amendment was enacted to eliminate confusion and forum-dependent outcomes, not to announce a departure from existing law.

This case fits squarely within the liability framework endorsed in *Gasic*. Plaintiff has sued American Airlines as an employer based on the conduct of its agents and employees who, while acting within the scope of their operational

11

authority, affirmatively facilitated, encouraged, and failed to interrupt the sexual assault of Ms. Solofra.

### D. Plaintiff Has Plausibly Alleged "Encouragement or Assistance" Under the IGVA.

American argues that Plaintiff has alleged only "knowledge plus inaction." (ECF 27 at 12.) That is wrong. The Complaint pleads specific, affirmative conduct by American's flight crew that plausibly constitutes "assistance" and "encouragement" under the IGVA.

The IGVA imposes liability not only on those who personally commit gender-based violence, but also on those who "personally encourage or assist" it. 735 ILCS 5/11-1003(a). The statute does not require express verbal urging; facilitation through conduct suffices. Plaintiff alleges that prior to and during the flight, American's flight attendants repeatedly served alcohol to McAdams despite his visible intoxication and odor of alcohol, interacted with him socially, and left him seated next to Plaintiff. (ECF 20 ¶¶ 1, 19–21, 99–103.) While seated next to Plaintiff, McAdams escalated from unwanted conversation to physical assault, including grabbing Plaintiff's neck and breast. (*Id.* ¶¶ 22–24.) Despite an audible disturbance and Plaintiff telling McAdams to stop, no flight attendant intervened at any time. (*Id.* ¶¶ 25–27.)

These allegations must be viewed in context. Plaintiff alleges that American Airlines had long-standing knowledge of the risk of alcohol-facilitated in-flight sexual assaults through prior incidents and industry-wide warnings, yet continued the same practices. (*Id.* ¶¶ 35-48.) She further alleges that American has a documented history of disregarding victims while enabling known or suspected sexual predators aboard

its flights. (*Id.* ¶¶ 49–53.) Taken together, these allegations plausibly establish far more than passive nonfeasance. They describe affirmative facilitation of impairment, proximity, and emboldenment—the precise conditions that enabled the assault to occur and continue.

Alcohol service was not incidental to the assault; it was one means by which the abuse was facilitated. Plaintiff alleges that despite obvious intoxication, American continued serving McAdams alcohol and encouraged his behavior. (*Id.* ¶¶ 21–24.) Serving alcohol is an affirmative act, not inaction, and continuing to do so in the face of known risk plausibly constitutes "assistance" within the statute's meaning.

Plaintiff also alleges that American exercised exclusive control over boarding decisions, alcohol service, seating assignments, and passenger separation within the aircraft cabin. (*Id.* ¶¶ 97–105, 108.) Despite its knowledge of the foreseeable risk posed by intoxicated passengers, American permitted McAdams to board, continued serving him alcohol, seated Plaintiff immediately next to him in a fully booked cabin, and failed to intervene as his conduct escalated into an audible and physical assault. (*Id.* ¶¶ 17–21, 27, 97–106.) The IGVA does not require that a defendant physically touch the victim to be liable. 735 ILCS 5/11-1003(a). Facilitating continued access, proximity, and isolation—particularly through affirmative conduct taken in the face of known and foreseeable risk—constitutes actionable "assistance."

The authorities cited by Defendant do not compel dismissal. In *Rosas v. Komatsu Am. Corp.*, U.S. Dist. LEXIS 173708, *11-12 (C.D. Ill. 218) the court found no IGVA liability where the supervisor "essentially did nothing," amounting to "simple acquiescence" rather than encouragement or assistance. Here, the Complaint

13

alleges the opposite. American, through its employees' conduct, is alleged to have overserved alcohol to a visibly intoxicated passenger, interacted with him socially, seated Plaintiff in unavoidable proximity, and failed to intervene despite audible escalation and ongoing assault. (ECF 20 ¶¶ 17–27.) Those allegations describe active facilitation, not mere inaction.

*Charles v. Siegfried*, 165 Ill. 2d 482 (1995), is likewise inapposite. *Charles* addressed proximate cause under common-law and Dramshop theories and held that alcohol service alone was too remote to impose liability. *Id.* at 486. This case arises under the IGVA, a distinct statutory scheme imposing liability on those who "encourage or assist" gender-based violence. Alcohol service is alleged here as one component of a broader pattern of affirmative conduct, including seating decisions, continued proximity, and failure to intervene in an escalating assault. *Charles* does not define causation under the IGVA and does not foreclose statutory liability in this context.

Taken as true, the Complaint plausibly alleges that American Airlines, with long-standing knowledge of the risk of alcohol-facilitated sexual assault, engaged in affirmative conduct that created, sustained, and prolonged the conditions under which Plaintiff was assaulted. Whether that conduct constitutes "encouragement or assistance" under the IGVA presents a fact-intensive inquiry that cannot be resolved on a motion to dismiss.

### E. The Gender Violence Act Is Properly Applied Here Because Defendant's Actionable Conduct Arose in Illinois.

American Airlines argues that the IGVA is inapplicable because "McAdams committed his alleged acts outside of Illinois." That argument improperly reframes the pleadings in Defendant's favor. At the Rule 12(b)(6) stage, the Court must construe all facts and reasonable inferences in Plaintiff's favor, and the Complaint plausibly alleges Illinois-based conduct by American Airlines that constitutes "encouragement or assistance" under the Act.

Plaintiff purchased her ticket in Illinois, boarded in Chicago, and was seated by American Airlines personnel in a boxed-in middle seat beside a visibly intoxicated passenger in Chicago. (ECF 20 ¶¶ 15, 17–19, 109). American Airlines allowed that intoxicated passenger to board in Illinois, continued serving him alcohol, and failed to intervene as his behavior escalated—all despite longstanding knowledge of alcohol-facilitated in-flight sexual assaults. *(Id.)* These decisions form the gravamen of the IGVA claim and are rooted in Defendant's conduct on a flight originating in Illinois.

To avoid that straightforward reading, American Airlines asks the Court to focus only on the moment that McAdams physically touched Plaintiff and to ignore the dozens of pre-flight decisions rooted in Illinois that led to the abuse. But the law does not require that. The very case American Airlines cites—*Tavel v. Riddle*, 2021 U.S. Dist. LEXIS 55308 (N.D. Ill. 2021)—confirms that dismissal is improper. *Tavel* held that whether conduct "occurred primarily and substantially in Illinois" is a fact-intensive question that cannot be resolved on a motion to dismiss. *Id.* at 6.

## CONCLUSION

For all of these reasons, Plaintiff has plausibly stated claims under the Illinois Gender Violence Act, the Illinois Consumer Fraud Act, and for fraudulent

concealment. Defendant's arguments either misstate the governing legal standards, improperly recast well-pleaded factual allegations in its favor, or rely on factual disputes that cannot be resolved at the pleading stage. Defendant's Motion to Dismiss should be denied in its entirety. If the Court concludes that any claim requires additional particularity, Plaintiff respectfully requests leave to amend rather than dismissal with prejudice.

**DATED**: February 9, 2026

Respectfully submitted,

*Daisy Ayllon*

_____
Attorney for the Plaintiff

Antonio Romanucci
aromanucci@rblaw.net
Daisy Ayllon
dayllon@rblaw.net
Sarah M. Raisch
sraisch@rblaw.net
**ROMANUCCI & BLANDIN, LLC**
321 N. Clark St., Suite 900
Chicago, IL 60654
Tel: (312) 253-8618
Fax: (312) 458-1004

16

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certify that on **February 9, 2026**, she electronically filed the foregoing **Plaintiff's Response in Opposition to Defendant American Airlines, Inc's Motion to Dismiss,** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all CM/ECF participants:

By: /s/ *Daisy Ayllon*
One of Plaintiff's Attorneys

FILED DATE: 5/8/2024 3:59 PM   2023L005728

# Exhibit A

STATE OF ILLINOIS
103rd GENERAL ASSEMBLY
HOUSE OF REPRESENTATIVES
TRANSCRIPTION DEBATE

26th Legislative Day                                    3/23/2023


Speaker Manley:  "The House will be in order. Members will be in their chairs. We shall be led today by Syed E. Ahmad, a civic and faith leader from the Muslim Civic Coalition and the Islamic Center of Peoria, Illinois. Syed is the guest of Rep. Mussman. Members and guests are asked to refrain from starting their laptops, turn off your cell phones, and rise for the invocation and Pledge of Allegiance. Mr. Ahmad."

Syed Ahmad:  "Thank you, Madam Speaker. As the introduction stated, I am Syed Ahmad. I am from the City of Peoria. Just a little bit of background about my connections to Peoria. There's a saying that my dad used to say, 'You are from the soil where your ancestors are buried and your children are born.' I can tell you my dad, who recently passed away, is buried in Peoria, forever a Peorian. And my children are born in Peoria. So, I am a Peorian, and I'm from Illinois, and proud to be one. Thank you. So, today is the first day of Ramadan for our Muslims here in Illinois and across the world. Ramadan is specifically a month of fasting and a month of additional worship for the Muslim faith. Illinois, as some of you may know or may not know, has the largest per capita Muslim population in the entire United States. The invocation that I'm about to give necessitates the asking of help and assistance from a higher power. As a Muslim, I can only worship and invoke one God, and none besides Him, the God of Abraham, Moses, Jesus, and Mohammed. Peace and blessings be upon each of them. We believe guidance is only through Him and ask that he guide this House and the people of this state. We begin. With the name of God, the most merciful, the most rewarding. Praise and thanks to the Lord, the king of the

10300026.docx                                              1

STATE OF ILLINOIS
103rd GENERAL ASSEMBLY
HOUSE OF REPRESENTATIVES
TRANSCRIPTION DEBATE

26th Legislative Day                          3/23/2023

Speaker Hoffman:  "The question is, 'Shall House Bill 1297 pass?'
All those in favor indicate by voting 'yes'; those opposed
vote 'no'. The voting is open. Have all voted who wish? Have
all voted who wish? Have all voted who wish? Mr. Clerk, please
take the record. On this question, there are 101 voting 'yes',
8 voting 'no', 0 voting 'present'. And this Bill, having
received a Constitutional Majority, is hereby declared
passed. Representative Guzzardi on House Bill 1363. Mr.
Clerk, please read the Bill."

Clerk Bolin:  "House Bill 1363, a Bill for an Act concerning civil
law. Third Reading of this House Bill."

Speaker Hoffman:  "Representative Guzzardi."

Guzzardi:  "Thank you, Mr. Speaker. This Bill pertains to the
Gender Violence Act in Illinois Code. The Act is provided to
protect victims and survivors of gender-based violence. One
of the key features of the Act is it has a longer statute of
limitations than other forms of relief for these survivors
because we know that there's often delayed outcry on behalf
of survivors of these kinds of offenses. The measure before
us today reflects an agreement between the stakeholders and
the business community. This is an agreed Bill that's before
us today. There has been some discussion in the courts about
when or if an employer ought to be liable for their… gender-
based violence performed by their employees. Some courts have
said yes. Some courts have said no. That lack of clarity is
not good for survivors. And it's also not good for employers,
which is why the employer community negotiated on this Bill
and why it's an agreed Bill between the employers and the
advocates. It's an agreed Bill. So, the agreement here… again,

10300026.docx                                          77

STATE OF ILLINOIS
103rd GENERAL ASSEMBLY
HOUSE OF REPRESENTATIVES
TRANSCRIPTION DEBATE

26th Legislative Day                         3/23/2023

it's an agreed Bill. The agreement describes the circumstances under which an employer might be held liable for this kind of conduct and, importantly, when the employer might not be held liability for such conduct. And it clarifies that this employer liable, the… the statute of limitations is extended to four years rather than two for the traditional claims that one… one might pursue in these other instances otherwise. So, this Bill represents an agreement between the advocates and the employers. The employers have agreed to this language. There is no opposition, and I urge an 'aye' vote."

Speaker Hoffman: "Representative Ugaste."

Ugaste: "Thank you, Mr. Speaker. I'm going to go right to the Bill."

Speaker Hoffman: "To the Bill."

Ugaste: "The Sponsor's indicated numerous times there's… this is an agreed Bill. To state that on this floor, I believe, indicates that it's been through the agreed Bill process, which is part of a labor-business process in which each side negotiates and gets something that it wants out of a Bill. I don't think that's what this is at all. And then I think what you have here, Mr. Sponsor, is the fact that what we have is an agreement between one or two members of the business community with some changes you agreed to make. You did agree to make some changes. Them going neutral on the Bill. Not agreeing to it. Not saying, this is the proposal we want to put forward. So, I think to say it's an agreed Bill here on the floor is somewhat the wrong wording to use. Let's just leave it at that. But about the Bill. This Bill is codifying

STATE OF ILLINOIS
103rd GENERAL ASSEMBLY
HOUSE OF REPRESENTATIVES
TRANSCRIPTION DEBATE

26th Legislative Day                                    3/23/2023

what already exists in law. All it's doing is adding more fuel for the various groups to try and make money off of litigation in this state. And it's going to hamper business and going to have to keep them from hiring more people, investing in their businesses, and expanding the Illinois economy. What we have is an instance where the injured individual could already collect under other laws of the state and, using an agency theory in law, still collect from the employer if there's something in fact that the employer did to contribute to this. But instead of doing that, we're going to circumvent it, cause more litigation, and bring down our economy even further. I urge a 'no' vote."

Speaker Hoffman:   "Seeing no one seeking further recognition, Representative Guzzardi to close."

Guzzardi:   "Thank you, Mr. Speaker. I urge an 'aye' vote."

Speaker Hoffman:   "The question is, 'Shall House Bill 1363 pass?' All those in favor vote 'aye'; all opposed vote 'nay'. The voting is open. Have all voted who wish? Have all voted who wish? Have all voted who wish? Mr. Clerk, please take the record. On this question, there's 71 voting 'yes', 38 voting 'no', 0 voting 'present'. And this Bill, having received the Constitutional Majority, is hereby declared passed. Remaining on page 24 of the Calendar, Representative Kifowit on House Bill 1398. Mr. Clerk, please read the Bill."

Clerk Hollman:   "House Bill 1398, a Bill for an Act concerning government. Third Reading of this House Bill."

Speaker Hoffman:   "Representative Kifowit. Out of the record. Moving to page 25 of the Calendar, House Bill 1409,

STATE OF ILLINOIS
103rd GENERAL ASSEMBLY
HOUSE OF REPRESENTATIVES
TRANSCRIPTION DEBATE

26th Legislative Day                                    3/23/2023

Representative Will Davis. Representative Davis. Mr. Clerk, please read the Bill."

Clerk Hollman:  "House Bill 1409, a Bill for an Act concerning finance. Third Reading of this House Bill."

Speaker Hoffman:  "Representative Davis."

Davis, W.:  "Thank you very much, Mr. Speaker, Ladies and Gentlemen of the House. House Bill 1409 is my effort to try to move the professional services side of IDOT and CDB in the selection process and put it under the BEP Act so that BEP goals can apply to that side of the process. We often talk a lot about construction. And when we talk about goals, we talk about the actual construction goals on the construction, meaning the actual building of things. But even before you get to that point, there is a professional services side, or QBS selection, where we're selecting the engineers, the architects, and folks that do that work. So, what this is, is about making sure that we can put goals on that side of the construction process as well. That's always kind of quiet. It's kind of done in a very selective kind of way. We see evidence of the same contractors getting work over and over again. And others that are trying to get in don't get in. So, this is also an effort to try to make sure that… and as much as I and others will like to see diversity on projects, that we put diversity in that space as well. So, that's essentially what it does. I'd be more than happy to answer any questions, Mr. Speaker."

Speaker Hoffman:  "On this question, Leader Windhorst."

Windhorst:  "Thank you, Mr. Speaker. Will the Sponsor yield?"

Speaker Hoffman:  "He indicates he'll yield."

STATE OF ILLINOIS
103rd GENERAL ASSEMBLY
HOUSE OF REPRESENTATIVES
TRANSCRIPTION DEBATE

26th Legislative Day                                    3/23/2023

Speaker Hoffman:   "Leader Gabel moves for the adoption of the Agreed Resolutions. All those in favor say 'aye'; all those opposed say 'nay'. In the opinion of the Chair, the 'ayes' have it. And the Agreed Resolutions are adopted. And now, allowing perfunctory time for the Clerk, Leader Gabel moves that House stand adjourned until Friday, March 24, at the hour of 11 a.m. All those in favor signify by saying 'aye'; all opposed say 'nay'. In the opinion of the Chair, the 'ayes' have it. And the House stands adjourned."

Clerk Hollman:   "House Perfunctory Session will come to order. Committee Reports. Representative Gabel, Chairperson from the Committee on Rules reports the following committee action taken on March 23, 2023: recommends be adopted, referred to the floor is Floor Amendment(s) 2 to House Bill 2820, Floor Amendment(s) 2 to House Bill 3751, and Floor Amendment(s) 2 to House Bill 3957. Introduction and First Reading of House Bills. House Bill 4020, offered by Representative Cabello, a Bill for an Act concerning safety. House Bill 4021, offered by Representative Cabello, a Bill for an Act concerning liquor. House Bill 4022, offered by Representative Norma Hernandez, a Bill for an Act concerning appropriations. House Bill 4023, offered by Representative Cabello, a Bill for an Act concerning State government. House Bill 4024, offered by Representative Nichols, a Bill for an Act concerning appropriations. And House Bill 4025, offered by Representative Scherer, a Bill for an Act concerning regulation. First Reading of these House Bills. Introduction and First Reading of Senate Bills. Senate Bill 160, offered by Representative Ladisch Douglass, a Bill for an Act

STATE OF ILLINOIS
103rd GENERAL ASSEMBLY
HOUSE OF REPRESENTATIVES
TRANSCRIPTION DEBATE

26th Legislative Day                                          3/23/2023

concerning business. Senate Bill 1230, offered by Representative Stava-Murray, a Bill for an Act concerning regulation. Senate Bill 1233, offered by Representative Kifowit, a Bill for an Act concerning education. Senate Bill 1291, offered by Representative Hoffman, a Bill for an Act concerning civil law. Senate Bill 1402, offered by Representative LaPointe, a Bill for an Act concerning public aid. Senate Bill 1440, offered by Representative Huynh, a Bill for an Act concerning business. Senate Bill 1476, offered by Representative Rashid, a Bill for an Act concerning housing. Senate Bill 1494, offered by Representative Jones, a Bill for an Act concerning regulation. Senate Bill 1561, offered by Representative Lilly, a Bill for an Act concerning health. Senate Bill 1629, offered by Representative Kelly, a Bill for an Act concerning public employee benefits. Senate Bill 1630, offered by Representative Kelly, a Bill for an Act concerning public employee benefits. Senate Bill 1665, offered by Representative Moeller, a Bill for an Act concerning public aid. Senate Bill 1705, offered by Representative Kifowit, a Bill for an Act concerning revenue. Senate Bill 1707, offered by Representative Guerrero-Cuellar, a Bill for an Act concerning local government. Senate Bill 1818, offered by Representative Buckner, a Bill for an Act concerning the Illinois State flag. Senate Bill 1824, offered by Representative Yang Rohr, a Bill for an Act concerning public employee benefits. Senate Bill 1826, offered by Representative Stuart, a Bill for an Act concerning aging. Senate Bill 1861, offered by Representative Walsh, a Bill for an Act concerning local government. Senate Bill 1897, offered

STATE OF ILLINOIS
103rd GENERAL ASSEMBLY
HOUSE OF REPRESENTATIVES
TRANSCRIPTION DEBATE

26th Legislative Day                                    3/23/2023

by Representative Johnson, a Bill for an Act concerning local government. Senate Bill 1999, offered by Representative Ann Williams, a Bill for an Act concerning children. First Reading of these Senate Bills. There being no further business, the House Perfunctory Session will stand adjourned."